Robert V. Prongay (SBN 270796)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHARINE JAMESON, Derivatively on Behalf of Nominal Defendant GERON CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOHN A. SCARLETT, KARIN EASTHAM, V. BRYAN LAWLIS, SUSAN M. MOLINEAUX, ROBERT J. SPIEGEL, DANIEL M. BRADBURY, HOYOUNG HUH,<br><br>　　　　　Defendants.<br><br>　　and<br><br>GERON CORPORATION, a Delaware Corporation,<br><br>　　　　　Nominal Defendant, | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Plaintiff Katharine Jameson ("Plaintiff"), by and through her undersigned attorneys, brings

2  this derivative complaint for the benefit of nominal defendant, Geron Corporation ("Geron" or the

3  "Company"), against certain members of its Board of Directors (the "Board") and certain of its

4  executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment,

5  and violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's

6  allegations are based upon her personal knowledge as to herself and her own acts, and upon

7  information and belief, developed from the investigation and analysis by Plaintiff's counsel,

8  including a review of publicly available information, including filings by Geron with the U.S.

9  Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports,

10  investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

11  **I.      NATURE AND SUMMARY OF THE ACTION**

12    1.     Geron is a biopharmaceutical company.  Since late 2014, the Company was

13  developing its lead drug candidate, imetelstat, in collaboration with Janssen Biotech Inc.

14  ("Janssen").

15    2.     Janssen conducted a clinical study called IMbark that tested imetelstat for the

16  treatment of myelofibrosis.  The study was supervised by a joint steering committee of Geron and

17  Janssen employees.  The primary efficacy endpoints to measure the success of imetelstat in treating

18  myelofibrosis were spleen response rate and symptom response rate.  There were fourteen secondary

19  endpoints, including survival rate.  The last patient was enrolled in the IMbark study in October

20  2016, and the primary endpoints were measured twenty four weeks after patients began taking

21  imetelstat.

22    3.     In March 2018, the joint steering committee reviewed the data from the IMbark

23  study.  For several months thereafter, the Company touted the favorable survival rate observed in

24  the IMbark study and compared it to other clinical trials.  Geron stated that multiple outcome

25  measures suggested clinical benefit from the use of imetelstat.

26    4.     However, a biotech journalist doubted the results, noting that survival data could not

27  be compared with other studies without recognizing the baseline disease characteristics for the

28  patients in the IMbark study.  In an article published on March 27, 2018 on *STAT News*, he also

explained that myelofibrosis drugs are approved based on their ability to shrink enlarged spleens and reduce overall symptoms and speculated that the Company's focus on survival data suggested that the IMbark study failed to meet the primary efficacy endpoints necessary for regulatory approval.

5.   On this news, Geron's share price fell $1.75, or nearly 29%, to close at $4.23 per share on March 28, 2018, on unusually heavy trading volume.

6.   On September 27, 2018, Geron confirmed the journalist's suspicions by revealing that the IMbark study failed to meet its primary efficacy endpoints.   Additionally, Janssen terminated its collaboration agreement to develop imetelstat.

7.   On this news, the Company's share price fell $3.92, or over 62%, to close at $2.31 per share on September 27, 2018, on unusually heavy trading volume.  The share price continued to fall over the next trading session by nearly 24% to close at $1.76 per share on September 28, 2018.

8.   These revelations precipitated the filing of multiple securities class actions in this District against Geron and certain of defendants, captioned *Tollen v. Geron Corporation, et al.*, 3:20-cv-00547-WHA (the "Securities Class Action").

9.   Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of seven members, five of whom are named in this action.  As alleged herein, Scarlett as Chief Executive Officer and Eastham and Lawlis, as members of the Audit Committee, knew that the Company's sole prospect of generating sales revenue was a failure yet allowed misleading statements to be disseminated.  Moreover, Eastham, Lawlis, and Spiegel awarded compensation to themselves and officers who made and/or allowed materially misleading statements to be disseminated in Geron's SEC filings and other disclosures.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.   JURISDICTION AND VENUE

10.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant

to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**III.     PARTIES**

**Plaintiff**

12.     Plaintiff Katharine Jameson purchased 100 shares of Geron on March 22, 2018 and has continuously owned her stock since that date.

**Nominal Defendant**

13.     Nominal Defendant Geron is a Delaware corporation with its principal executive offices located at 149 Commonwealth Drive, Suite 2070, Menlo Park, CA 94025.  The Company's stock trades on the NASDAQ exchange under the symbol "GERN."

**Defendants**

14.     Defendant John A. Scarlett ("Scarlett") has served as Chief Executive Officer ("CEO") and a director of the Company since September 2011, as President since January 2012, and as Chairman of the Board since December 2018.

15.     Defendant Karin Eastham ("Eastham") has served as a director of the Company since March 2009.  She is Chair of the Audit Committee and a member of the Compensation Committee.

16.     Defendant V. Bryan Lawlis ("Lawlis") has served as a director of the Company since March 2012.  He is a member of the Audit and Compensation Committees.

17.     Defendant Susan M. Molineaux ("Molineaux") has served as a director of the Company since September 2012.

18.     Defendant Robert J. Spiegel ("Spiegel") has served as a director of the Company since May 2010.  He is Chair of the Compensation Committee.

19.     Defendant Daniel M. Bradbury ("Bradbury") served as a director of the Company from September 2012 to June 2019.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20.     Defendant Hoyoung Huh ("Huh") served as a director of the Company from September 2011 to December 2018.

21.     The defendants named in ¶¶ 14-20 are sometimes referred to hereinafter as the "Individual Defendants."

**Non-Party Directors**

22.     Dawn C. Bir ("Bir") has served as a director of the Company since March 2019.

23.     Elizabeth G. O'Farrell ("O'Farrell") has served as a director of the Company since March 2019.  She is a member of the Audit Committee.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers, directors, and/or fiduciaries of Geron and because of their ability to control the business and corporate affairs of Geron, at all relevant times, the Individual Defendants owed Geron and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Geron in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of Geron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Geron and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.      The Individual Defendants, because of their positions of control and authority as directors and/or officers of Geron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Geron, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26.     To discharge their duties, the officers and directors of Geron were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Geron were required to, among other things:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

   a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

   c. Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

   d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

27.   Geron is a biopharmaceutical company.  Its lead drug candidate is imetelstat, which is intended to treat certain cancers that occur in bone marrow.

28.   Geron was developing imetelstat in partnership with Janssen, a division of Johnson & Johnson, pursuant to a Collaboration and License Agreement ("CLA").  The Company received an upfront payment of $35 million when the CLA became effective on December 15, 2014 and would potentially receive additional payments depending upon the clinical results for imetelstat.

29.   The CLA granted Janssen the exclusive rights to develop and commercialize imetelstat worldwide for all indications in oncology, including hematologic myeloid malignancies, and all other human therapeutic uses.   Janssen was wholly responsible for developing, manufacturing, seeking regulatory approval for, and commercialization of, imetelstat.   Geron contributed 50% of the development costs of clinical trials.

30.     The IMbark trial is a Phase 2 clinical study to develop imetelstat for treatment of myelofibrosis ("MF").  It was conducted by Janssen and supervised by a Joint Steering Committee ("JSC") composed of three Geron employees and three Janssen employees.

31.     The two primary efficacy endpoints used to measure the success of imetelstat for myelofibrosis are: (i) spleen response rate, defined as the proportion of patients who achieve a greater than or equal to 35% reduction in spleen volume assessed by imaging; and (ii) symptom response rate, defined as the proportion of patients who achieve a greater than or equal to 50% reduction in Total Symptom Score, at twenty four weeks.  The study also had fourteen secondary outcome measures, the fifth of which was overall survival.

32.     Janssen could unilaterally discontinue the imetelstat program and terminate the CLA if imetelstat failed to meet criteria determined by Janssen or for any other reason.  Janssen would undertake a primary analysis of the IMbark study and notify Geron whether it would: (i) maintain the license rights granted under the CLA and continue the development of imetelstat; or (ii) discontinue the development of imetelstat and terminate the CLA.  Geron announced that it expected Janssen's decision by the end of the third quarter of 2018 (i.e., September 30, 2018).

33.     If Janssen continued with the collaboration, it would owe Geron a milestone payment of $65 million with hundreds of millions of dollars in additional milestone payments possible pursuant to the CLA.

34.     If Janssen terminated the CLA, Geron would face harsh consequences, including:

- [Geron] would no longer have the right to receive any milestone payments or royalties under the Collaboration Agreement;

- further development of imetelstat, if any, would be significantly delayed or terminated;

- [Geron] would bear all risks and costs related to any further clinical development, manufacturing, regulatory approval and commercialization of imetelstat, if any;

- [Geron] might determine that the commercial potential of imetelstat does not warrant further development of imetelstat by us, in which case the development of imetelstat would cease, which might cause [the Company] to cease operations;

- [Geron] would need to raise substantial additional capital if [it] were to choose to pursue imetelstat development on our own, or [it] would need to establish alternative collaborations with third parties, which might not be possible in a timely manner, or at all, or might not be possible on terms acceptable to [the Company], in which case it would likely be necessary for [Geron] to limit the size or scope of the imetelstat development program;

35.     The first patient enrolled in IMbark in September 2015, and the last enrolled in October 2016.  The two primary endpoints were measured twenty four weeks after patients began taking imetelstat, so the data for all patients in the IMbark trial was available by mid-2017. However, the study would continue until a set number of patients perished or April 2018, whichever came first.

36.     The JSC reviewed data from the IMbark study in March 2018 (prior to March 16, 2018).  All patients in the study took imetelstat, so the JSC knew the co-primary efficacy endpoint results (i.e., spleen reduction and symptom score results) based on the data review.

**B.     The Individual Defendants Caused the Company to Issue Materially Misleading Statements**

37.     On March 16, 2018, after the market closed, the Individual Defendants caused Geron to issue a press release entitled "Geron Corporation Reports Fourth Quarter and Annual 2017 Financial Results and Recent Events."  Regarding the IMbark study and results, the press release stated, in relevant part[1]:

> Janssen completed a third internal data review of IMbark in March 2018, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, ***including for survival***, and the Collaboration's Joint Steering Committee (JSC) made the following observations and implemented the following actions:
>
> - The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.
>
> - Outcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews.

---

[1] Unless otherwise stated, all emphasis in bold and italics is added.

- ***With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm***.

- The trial is officially being closed to new patient enrollment. More than 100 patients have been enrolled in IMbark to date, which is expected to be adequate to assess overall survival. ***Patients who remain in the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.***

- Based on the rate of deaths occurring in the trial, the protocol-specified primary analysis, ***which includes an assessment of overall survival***, will begin by the end of the second quarter of 2018.

- Upon the protocol-specified primary analysis, the main trial will be completed. The IMbark protocol is being amended to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive imetelstat treatment per investigator discretion. During the extension phase, standard data collection will primarily consist of safety information.

38.     The same day, the Individual Defendants caused Geron to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K").  The report was signed by the Individual Defendants.  In a section discussing the current status of IMbark, the 2017 10-K reiterated the statements in the press release.

39.     On March 19, 2018, before the market opened, Geron held a conference call with investors and analysts to discuss the Company's fourth quarter and annual results, as well as recent Company events.  During the call, when discussing the IMbark study, defendant Scarlett failed to address whether the primary efficacy endpoints had been met.  Instead, he focused on the survival rate by noting that the median overall survival for all patients had not yet been reached after a follow-up of nineteen months, i.e. the final median survival might be longer.  He stated in relevant part:

In reviewing the [IMbark] data, which was based on a January 2018 data cut, the Collaboration's Joint Steering Committee, or JSC, made the following observations: first, the safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies and no new safety signals were identified; second, outcome measures for efficacy, including spleen volume responses and reductions in total symptom score remain consistent with the prior data reviews; third, ***with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm.***

* * *

*Patients who remain in the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.*

* * *

Upon the completion of the protocol-specified primary analysis, the main trial will be completed.

As a third action, the JSC determined that Janssen will amend the IMbark protocol to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive imetelstat per investigator discretion. During the extension phase, standard data collection will primarily consist of safety information. Patients will be continued to be followed for survival.

*The assessment of survival is important because we believe that a new treatment that could confirm improved survival would represent a meaningful clinical outcome for patients who are relapsed or refractory to the only approved MF treatment today.* As experience with JAK inhibitors increases, both in the real world and clinical trial settings, we know that the majority of MF patients fail or stop JAK inhibitor treatment and data from recent literature and other sources suggest that the survival of these patients is limited.

For example, an analysis of real world data conducted by Janssen and presented at ASH in 2016 reviewed treatment patterns and outcomes of MF patients from two U.S. medical claims databases. *This analysis suggested that once patients fail or discontinue ruxolitinib, mean overall survival is approximately seven months.* Three other recently published and independent papers describing outcomes of MF patients after discontinuing JAK inhibitor treatment, either in the context of a clinical trial or through commercial supply, estimated median overall survival of approximately 14, 15 or 16 months, respectively. *Thus, imetelstat potentially could address a significant unmet medical need if its use is associated with survival that is meaningfully longer than 14 to 16 months.*

40.     The above statements in ¶¶ 37-39 were materially misleading because they failed to disclose: (a) that the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

41.     On March 27, 2018, during the 17th Annual Needham Healthcare Conference, defendant Scarlett presented a slide entitled "IMbark Internal Data Reviews, Findings to Date," summarizing "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018."   Specifically, the slide stated "Activity within multiple outcome measures [was] observed, suggesting clinical benefit. . . ."  These measures included "Range of reductions in spleen volume" and "Decreases in Total Symptoms Score," i.e. the primary efficacy endpoints.  The slide also stated, "Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)."

42.     The above statements in ¶ 41 were materially misleading because they failed to disclose: (a) that the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

**C.     The Truth Begins to Emerge While the Individual Defendants Continue to Issue Materially Misleading Statements**

43.     On March 27, 2018, Adam Feuerstein, a veteran biotech journalist, published an article on *STAT News*, an online life sciences publication, entitled "The top-performing biotech stock this year has surged on flimsy data."  In the article, Feuerstein opined that the statements on March 16 and March 19 about survival were intentionally misleading, stating in relevant part:

Is a median overall survival of 19 months meaningful for these myelofibrosis patients?

Yes, said Scarlett, even though the company's study lacks a control arm to compare against imetelstat for survival.

Undeterred, Scarlett compared the survival update from Geron's imetelstat study to a separate analysis of "real world" myelofibrosis patient outcomes presented at a medical meeting by Janssen in 2016.

For myelofibrosis patients who discontinued or no longer responded to Jakafi, median overall survival was seven months in the Janssen analysis, said Scarlett.

That single data makes imetelstat look better. But the rest of the study undermines his argument.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Of the 430 myelofibrosis patients who received Jakafi as a first-line therapy (the patient group highlighted by Scarlett), only 15 percent went on to receive a second-line treatment with a different drug. The other 85 percent of patients received no further treatment, suggesting they were too frail and close to death, according to the Janssen analysis.

*Janssen also looked at myelofibrosis patients who received another treatment after Jakafi. These patients lived a lot longer than seven months.*

Sixty-three patients received Jakafi first and then a different second-line treatment. Their median survival was 14 months. Another 49 patients started on Jakafi and then received Jakafi again. *Their median survival was 30 months. Blended together, the median survival for these 112 patients was approximately 22 months.*

By that comparison — which Scarlett did not mention last week — the 19- month median survival for imetelstat patients doesn't look as promising.

I asked Geron and Janssen to disclose the baseline disease characteristics of the 100 myelofibrosis patients enrolled in their Phase 2 study. That information — easily shared without compromising the conduct of the study — would help investors better interpret the interim imetelstat survival data.

Both companies declined the request.

44.     Feuerstein also speculated that the focus on survival data suggested that the IMbark study failed to meet its primary efficacy endpoints.  His article stated, in relevant part:

I also asked Geron and Janssen to explain why they've delayed by almost one year the disclosure of primary endpoint results from the Phase 2 study that would show, definitively, if myelofibrosis patients respond to treatment with imetelstat.

Again, they declined to share those data.

This is perhaps the most troubling aspect of the companies' behavior. Myelofibrosis drugs are approved based on their ability to shrink enlarged spleens and reduce overall disease symptoms. *These two efficacy measures are the co-primary endpoints of the imetelstat study, not survival, which is listed as the fifth secondary endpoint.*

The last myelofibrosis patient to enroll in the Geron and Janssen study did so in October 2016. The patients are treated with imetelstat for 24 weeks, which means spleen and symptom responses have been available to the companies since April 2017.

That's almost one year ago, so why haven't these results been disclosed publicly? "We are focused on survival in this myelofibrosis patient population," Geron spokesperson Anna Krassowska told me.

It's reasonable to assume Geron would be screaming from the biotech mountaintop had imetelstat showed meaningful disease activity in these hard-to-treat myelofibrosis patients. (Something other companies developing competing drugs have done.) ***Keeping those objective data under wraps — while focusing instead on a fuzzy survival talking point — is a significant red flag against imetelstat.***

45.     On this news, the Company's share price fell $1.75, or nearly 29%, to close at $4.23 per share on March 28, 2018, on unusually heavy trading volume.

46.     On May 10, 2018, the Individual Defendants caused Geron to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018, which stated, with respect to the IMbark trial: "The JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either dosing arm."

47.     On July 31, 2018, the Individual Defendants caused Geron to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018, which stated, regarding the IMbark study:  "The JSC also concluded that as of the January 2018 data cut-off date, with a median follow up of approximately 19 months, median overall survival had not been reached in either dosing arm."

48.     The above statements in ¶¶ 46-47 were materially misleading because they failed to disclose: (a) that the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

**D.     The Truth Fully Emerges**

49.     On September 27, 2018, the Company issued a press release entitled "Geron Announces Discontinuation of Imetelstat Collaboration with Janssen."  Therein, Geron disclosed that the IMbark study failed to meet its primary efficacy endpoints, stating in relevant part:

**IMbark Protocol-Specified Primary Analysis Highlights**

IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks. Key secondary endpoints are safety and overall survival.

For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%. No patients achieved complete remission, and one patient achieved partial remission.

50.     The Company also announced that Janssen had terminated its partnership with Geron for the development of imetelstat.

51.     The same day, Adam Feuerstein published another article on *STAT News*, stating: "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis." Feuerstein characterized this move as a "bait-and-switch tactic" and explained:

The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms. Geron and Janssen were keeping these data hidden, even though they were readily available. Shifting attention to survival was a smokescreen.

On Thursday, we learned why. The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent.

52.     On this news, the Company's share price fell $3.92, or over 62%, to close at $2.31 per share on September 27, 2018, on unusually heavy trading volume. The share price continued to fall over the next trading session by nearly 24% to close at $1.76 per share on September 28, 2018.

**E.     The Individual Defendants Issued a Materially Misleading Proxy Statement to Solicit Stockholder Votes**

53.     On March 30, 2018, defendants Scarlett, Eastham, Lawlis, Molineaux, Spiegel, Bradbury, and Huh issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held May 15, 2018. In the proxy statement, these seven defendants solicited stockholder votes in favor of three management proposals including: (i) a proposal to elect Scarlett and Spiegel to new terms as directors; and (ii) a proposal to approve the Company's 2018 Equity Incentive Plan (the "2018 Plan").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54.   The proxy statement disclosed that the Board had determined that defendant Scarlett was not independent.

55.   As the 2017 10-K stated, "[s]ubstantially all of [Geron's] revenues to date have been payments under collaborative agreements, royalties and other revenues from our licensing agreements." Thus, the clinical success of imetelstat, the Company's sole drug candidate, was critical to generating sales revenues.

56.   Regarding corporate governance and risk oversight, the proxy statement stated:

The Board and our executive management team work together to manage our risks. It is management's responsibility to identify various risks facing the Company, bring the Board's attention to material risks, and implement appropriate risk management policies and procedures to manage risk exposure on a day-to-day basis. The Board has an active role in overseeing our risk management process directly or through its committees.

The Board has delegated responsibility for the oversight of specific risks to the Board committees as follows:

- The Audit Committee oversees management of financial risks. In addition to fulfilling its responsibilities for the oversight of our financial reporting processes and annual audit of Geron's financial statements, the Audit Committee also reviews with the independent registered public accounting firm and the Company's management the adequacy and effectiveness of our policies and procedures to assess, monitor and manage fraud risk and our ethical compliance program. The Audit Committee takes appropriate actions to set the best practices and highest standards for quality financial reporting, sound business risk practices and ethical behavior.

- The Compensation Committee is responsible for overseeing the management of risks relating to our employment policies and executive compensation plans and arrangements. In connection with structuring the executive compensation program, the Compensation Committee, together with the Board, considers whether the elements of such program, individually or in the aggregate, encourage our Named Executive Officers to take unnecessary risks. For further information, see the sub-section entitled "Risk Assessment of Compensation Policies and Practices."

- The Nominating and Corporate Governance Committee manages Geron's corporate governance practices. In addition, the Nominating and Corporate Governance Committee reviews risks associated with the independence of the Board, potential conflicts of interest and risks relating to management and Board succession planning.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

While each committee is responsible for evaluating certain risks and overseeing the management of such risks within its respective oversight area, the entire Board is regularly informed through committee reports about such risks.

57.    Regarding non-employee director compensation, the proxy statement told stockholders that each of Bradbury, Eastham, Lawlis, Huh, Molineaux, and Spiegel received compensation from Geron for their service on the Board during 2017 ranging between $146,645 and $171,645.  In addition to this excessive compensation, the 2018 Incentive Plan authorizes the issuance of shares of the Company's common stock for equity awards to Geron's employees and directors.  As of March 8, 2018, 2,903,727 shares were available for future grant.

58.    The proxy statement also stated that 2017 executive compensation was awarded based on the Company's business activities.  Specifically, it stated:

Our corporate goals for 2017 primarily focused on collaborating with Janssen to further the imetelstat program through active engagement with Janssen on the clinical development decision-making for the IMbark and IMerge clinical trials, and developing our own contingency plans to prepare us to resume imetelstat clinical development in the event that Janssen elects to discontinue the program. In addition, in 2017, corporate development activities continued to focus on efforts to identify and evaluate potential oncology product candidates, programs or companies to grow or diversify our business through acquisition and/or in-licensing, and we conducted due diligence for a number of potential targets. The Compensation Committee and the independent members of the Board (the "Independent Board"), evaluated our achievements in 2017 and determined that we achieved 100% of our 2017 corporate goals. The Compensation Committee and the Independent Board also determined that our Named Executive Officers, including our Chief Executive Officer, contributed significantly towards accomplishing these corporate goals, as well as successfully leading individual, team, departmental and functional performance and achievements.

59.    According to the proxy statement, the 2018 Plan is administered by the Board or a committee of non-employee directors.  Moreover, equity pursuant to the 2018 Plan is effectively awarded at the discretion of the Board:

The Board and any committee of non-employee directors to whom the Board may delegate authority to administer the 2018 Plan are each considered to be a Plan Administrator for purposes of this Proposal 3. Subject to the terms of the 2018 Plan, the Plan Administrator may determine the recipients, the types of stock awards to be granted, the number of shares of our Common Stock subject to or the cash value of stock awards, and the terms and conditions of stock awards granted under the 2018 Plan, including the period of their exercisability and vesting. The Plan Administrator also has the authority to provide for accelerated exercisability and vesting of stock

awards. Subject to the limitations set forth below, the Plan Administrator also determines the fair market value applicable to a stock award and the exercise or strike price of stock options and stock appreciation rights granted under the 2018 Plan.

60.     The proxy statement solicited shareholder approval of an amendment to the 2018 Plan to increase the number of shares of common stock reserved for issuance thereunder by 10 million shares.  If approved, the total number of shares reserved for issuance would be 12,903,727 shares, which represents 8% of the Company's common stock outstanding as of March 8, 2018.

61.     The proxy statement was material misleading for the following reasons: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.  A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

62.     On May 18, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement.  In particular: (i) Scarlett and Spiegel were reelected to terms as directors; and (ii) the 2018 Equity Incentive Plan was approved by stockholders.  The reelection of Scarlett and Spiegel and approval of the 2018 Equity Incentive Plan based on the misleading statements contained in the 2018 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of at the expense of the Company's unaffiliated stockholders.

## VI.     DAMAGES TO THE COMPANY

63.     As a direct and proximate result of the Individual Defendants' conduct, Geron has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.     Legal fees incurred in connection with the Securities Class Action;

b.     Any funds paid to settle the Securities Class Action; and

c.     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Geron.

64.     In addition, Geron's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted

the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

65.     The actions complained of herein have irreparably damaged Geron's corporate image and goodwill.  For at least the foreseeable future, Geron will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Geron's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.     Plaintiff brings this action derivatively in the right and for the benefit of Geron to redress injuries suffered, and to be suffered, by Geron as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, and violation of Section 14(a) of the Exchange Act.  Geron is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

67.     Plaintiff will adequately and fairly represent the interests of Geron in enforcing and prosecuting its rights.

68.     Plaintiff has continuously been a shareholder of Geron at times relevant to the wrongdoing complained of and is a current Geron shareholder.

69.     When this action was filed, Geron's Board of Directors consisted of seven directors: defendants Scarlett, Eastam, Lawlis, Molineaux, and Spiegel and non-party directors Bir and O'Farrell.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Defendant Scarlett**

70.     At all relevant times, Scarlett was the Company's President and CEO, and therefore was not independent under NASDAQ listing rules.  As an employee, Scarlett derives substantially all of his income from his employment with Geron, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Moreover, as CEO, Scarlett knew the IMbark clinical results, including that the study failed to meet its primary

endpoints.  Scarlett personally issued the misleading statements alleged herein.  As a result, Scarlett would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants Eastham and Lawlis**

71.    Eastham and Lawlis served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, the Company had reviewed the IMbark clinical results as early as March 2018, thus it is reasonable to infer that Eastham and Lawlis knew the study failed to meet its primary efficacy endpoints.  As alleged herein, Eastham and Lawlis failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Geron's SEC filings and other disclosures.  Thus, Eastham and Lawlis breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Eastham, Lawlis, and Spiegel**

72.    Eastham, Lawlis, and Spiegel served as the members of the Compensation Committee at all relevant times.  As such, they are responsible for reviewing and approving executive compensation based upon officers' performance with respect to corporate goals, including decisions related to the IMbark study.  As alleged herein, the Company had reviewed the IMbark clinical results as early as March 2018, thus it is reasonable to infer that Eastham, Lawlis, and Spiegel knew the study failed to meet its primary efficacy endpoints.  As alleged herein, Eastham, Lawlis, and Spiegel awarded compensation to themselves and officers who made and/or allowed materially misleading statements to be disseminated in Geron's SEC filings and other disclosures.  Thus, Eastham, Lawlis, and Spiegel breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel**

73.    Scarlett, Eastham, Lawlis, Molineaux, and Spiegel could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in March 2018.  These five directors issued the proxy statement knowing that representations made in the Company's SEC filings and other disclosures were misleading with respect to the IMbark clinical results, and they

1   did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in May

2   2018.  Had these five directors truthfully and completely revealed the misleading nature of the

3   Company's public statements, Scarlett and Spiegel would not have been reelected as directors and

4   the 2018 Equity Incentive Plan would not have been approved.  As a result, Scarlett, Eastham,

5   Lawlis, Molineaux, and Spiegel would be interested in a demand regarding the misleading proxy

6   statement, and demand is excused as to them on that basis as well.

7   <u>**COUNT I**</u>

8   **Against the Individual Defendants for Breach of Fiduciary Duty**

9   74.   Plaintiff incorporates by reference and realleges each and every allegation contained

10   above, as though fully set forth herein.

11   75.   Each Individual Defendant owes and owed to the Company the duty to exercise

12   candor, good faith, and loyalty in the management and administration of Geron's business and

13   affairs, particularly with respect to issues as fundamental as public disclosures.

14   76.   The Individual Defendants' conduct set forth herein was due to their intentional or

15   reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants

16   intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and

17   interests of Geron.

18   77.   In breach of their fiduciary duties owed to Geron, the Individual Defendants willfully

19   participated in and caused the Company to expend unnecessarily its corporate funds, rendering them

20   personally liable to the Company for breaching their fiduciary duties.

21   78.   In particular, the Individual Defendants knowingly or recklessly made untrue

22   statements and/or permitted the Company's public filings, disclosures, and statements to

23   misleadingly represent the success of its lead drug candidate, imetelstat.

24   79.   As a direct and proximate result of the Individual Defendants' breaches of their

25   fiduciary obligations, Geron has sustained and continues to sustain significant damages.  Including

26   direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in

27   the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the

28   Company.

## COUNT II

**Against the Individual Defendants for Unjust Enrichment**

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Geron.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Geron.

82.     Plaintiff, as a stockholder and representative of Geron, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

83.     Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Violation of Section 14 of the
Securities Exchange Act of 1934**

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omtis to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on March 30, 2018 violated §14(a) and Rule 14a-9 because: (i) it misrepresented the Board's activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

86.     In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

87.     The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited shareholder votes for: (i) director nominees; (ii) executive compensation; (iii) approval of the 2018 Equity Incentive Plan; and (iv) ratification of the appointment of the Company's independent auditor.  The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

88.     The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Geron, demands judgment as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Geron and that plaintiff is an adequate representative of the Company;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Geron

D.     Directing Geron to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Geron and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

1        3.   a proposal to strengthen Geron's oversight of its disclosure procedures;

2        4.   a provision to control insider transactions; and

3        5.   a provision to permit the stockholders of Geron to nominate at least three candidates for election to the Board;

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Geron has an effective remedy;

F.     Awarding to Geron restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

DATED:  April 23, 2020        **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Robert V. Prongay*
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, NY 10019
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

*Attorneys for Plaintiff Katharine Jameson*

## **VERIFICATION**

I, Katharine Jameson, do hereby verify that I am a holder of common stock of Geron Corporation, and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 4/15/2020

DocuSigned by:

*Katharine Jameson*
3E2511DF9924434...

Katharine Jameson