**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (*pro hac vice* to be filed)
Jeffrey P. Campisi (*pro hac vice* to be filed)
850 Third Avenue
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-771
*rkaplan@kaplanfox.com*
*jcampisi@kaplanfox.com*

*Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JULIA JUNGE and RICHARD JUNGE, on behalf of themselves and a class of similarly situated investors,<br><br>Plaintiff,<br><br>v.<br><br>GERON CORPORATION and JOHN A. SCARLETT,<br><br>Defendants. | Case No. 3:20-cv-00547-WHA<br><br>*Related to*<br><br>Case No. 3:20-cv-01163-WHA |
| EUGENE CONNOR, on behalf of themselves and a class of similarly situated investors,<br><br>Plaintiff,<br><br>v.<br><br>GERON CORPORATION and JOHN A. SCARLETT,<br><br>Defendants. | **Class Action**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**Jury Trial Demanded** |

## TABLE OF CONTENTS

Page


I. SUMMARY OF THE ACTION ........ 1

II. INTRODUCTION ........ 3

III. JURISDICTION AND VENUE ........ 8

IV. PARTIES ........ 8

V. BACKGROUND ........ 9

A. Geron's Collaboration and License Agreement with Janssen ........ 9

B. The CLA's Joint Geron-Janssen Governance Committees ........ 11

C. IMbark Was a Phase 2 Clinical Study of Imetelstat for MF ........ 12

D. The JSC Reviews IMbark Trial Data ........ 14

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........ 16

VII. THE TRUTH BEGINS TO EMERGE ........ 29

VIII. LOSS CAUSATION ........ 30

IX. ADDITIONAL SCIENTER ALLEGATIONS ........ 31

X. NO SAFE HARBOR ........ 32

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ........ 32

XII. CLASS ACTION ALLEGATIONS ........ 34

XIII. CAUSES OF ACTION ........ 35

COUNT I FOR VIOLATION OF § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS ........ 35

COUNT II FOR VIOLATION OF § 20(A) OF THE EXCHANGE ACT AGAINST DEFENDANT SCARLETT ........ 36

PRAYER FOR RELIEF ........ 36

JURY DEMAND ........ 37

Lead Plaintiffs Julia and Richard Junge, on behalf of themselves and a class of similarly situated investors ("Plaintiff"), by and through Plaintiff's counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: 1) the public filings made by Geron Corporation ("Geron" or the "Company") with the United States Securities and Exchange Commission ("SEC"); 2) press releases and media reports issued by and disseminated by the Company; 3) analyst reports, media reports, and other publicly disclosed reports and information about the Company; 4) conference calls with Company executives, analysts and investors; 5) information based on consultation with experts in loss causation, economic loss, and hematology; and 6) publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Geron's common stock. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Geron common stock between March 19, 2018 and September 26, 2018, inclusive (the "Class Period"), who were damaged thereby (the "Class"). The claims asserted herein are alleged against Geron, and the Company's President and Chief Executive Officer ("CEO") John A. Scarlett ("Scarlett"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2. Myelofibrosis ("MF") is a rare, chronic blood cancer in which excessive scar tissue forms in the bone marrow and impairs its ability to produce normal blood cells. MF has the worst prognosis and poorest quality of life of all the chronic blood cancers. MF causes severe debilitating symptoms, including an enlarged spleen (splenomegaly), which causes pain and negatively affects white and red blood cell production, leading to anemia and increased risk of infection. Other severe and debilitating symptoms that degrade quality of life include abdominal pain, fatigue, fever, weight loss, bone pain, and itching. Because MF patients have severe disease burden and reduced

quality of life, disease management is focused on the relief of symptoms and improvement in quality of life. Due to MF's severe debilitating symptoms, MF patients are not likely to undertake a treatment that does not substantially reduce these symptoms.

3. Before the Class Period, Defendants, along with Geron's development partner, Janssen Biotech Inc. ("Janssen"), a division of Johnson & Johnson, were conducting a Phase 2 clinical trial called IMbark on the Company's only drug candidate, imetelstat. IMbark was designed to ascertain whether imetelstat was effective in reducing spleen size and reducing debilitating symptoms in MF patients. There was no control group, i.e. patients who were given a placebo.

4. In a clinical study's protocol, a primary endpoint is the planned outcome measure that is the most important outcome for evaluating the effect of a treatment. IMbark's co-primary endpoints measured whether patients experienced meaningful reduction in spleen size of ≥35%, and a reduction of debilitating symptoms of ≥50%, as measured by a uniform scoring system. Reduction in spleen volume was selected because splenomegaly (an enlarged and often painful spleen) is a hallmark symptom of MF and can be objectively measured. Symptom response rate scoring provided a uniform data set and a second objective method to assess whether imetelstat was reducing the severity of a patient's symptoms and improving quality of life. Moreover, these co-primary endpoints were selected by Defendants because they were the endpoints used to gain U.S. Food and Drug Administration ("FDA") approval for Jakafi (ruxolitinib), then the only approved drug for adults with certain types of MF.

5. In contrast, a secondary endpoint is not as important as the primary outcome measure for evaluating the effect of a drug, but is still of interest. Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm, and, as a result, overall survival data in such studies may be unreliable due to variability in patient selection and baseline patient health conditions, and therefore this outcome may be biased and overstate or understate drug efficacy. To the contrary, IMbark's two primary endpoints, reduction of spleen size and reduction of debilitating symptoms, were measurable objectively and were the key endpoints to determine whether imetelstat was effective.

6. By the start of the Class Period, Defendants had learned of material, adverse results from the IMbark study, which showed that imetelstat was not effective in improving the debilitating symptoms of MF and patient quality of life because 90% of patients did not experience a reduction in spleen volume of ≥35%, and 68% did not experience a reduction in debilitating symptoms of ≥50%, results that were not meaningful compared to the outcomes produced by Jakafi and outcomes in a pilot study on imetelstat.

7. The material, adverse results were a disaster for Geron because Janssen was evaluating whether to continue its partnership with Geron based, in material part, on the IMbark study results, and the material, adverse results increased the risk that Janssen would terminate its agreement with Geron, thereby shifting all of the financial burden to Geron to continue development of imetelstat if it determined to continue its development.

8. During the Class Period, Defendants violated the federal securities laws by covering up the material, adverse results, and making misleading representations concerning the IMbark study data results. While knowing of the material, adverse results of the IMbark study and that they materially increased the risk Janssen would abandon development of imetelstat, Defendants raised over $84 million in stock offerings throughout the Class Period, and Geron insiders, including its general counsel and a director, sold millions of dollars of stock just weeks before the end of the Class Period. When the truth was disclosed at the end of the Class Period, Geron's stock crashed and has never recovered. Defendants should be held accountable for these clear violations of the federal securities laws.

## II. INTRODUCTION

9. Geron is a biopharmaceutical company. The Company's only drug product candidate is imetelstat. At or around the start of the Class Period, Geron had 15 full-time employees and three part-time employees.

10. In 2013, Defendants disclosed the results of a pilot study of MF patients taking imetelstat that showed 39% of patients with enlarged spleens achieved reduction in spleen size of ≥50%, and symptom responses of ≥50% were observed in 77% of patients. Furthermore, 23% experienced a complete or partial remission, and another 18% experienced clinical improvements,

for a total of over 40% of patients experiencing a complete or partial remission, or clinical improvement. Defendant Scarlett described these results as "unprecedented" and "durable".

11. In November 2014, capitalizing on the promising results from the pilot study, Geron entered into a collaboration and licensing agreement ("CLA") with Janssen for the development of imetelstat for all indications in oncology, including MF, which resulted in a $35 million payment to Geron, with the potential for hundreds of millions more if imetelstat proved effective in treating MF.

12. In 2015, Defendants and Janssen initiated the IMbark study. Under the CLA, while Janssen was responsible for conducting the IMbark study, Geron shared expenses with Janssen and monitored the progress of the study and the data collected through the Joint Steering Committee ("JSC"), which consisted of both senior Geron and Janssen executives. Melissa A. Kelly Behrs ("Behrs"), Geron's Executive Vice President, Business Development and Portfolio & Alliance Management, and Andrew J. Grethlein ("Grethlein"), Geron's Executive Vice President, Development and Technical Operations, were members of the JSC and its various governance and other committees. Behrs and Grethlein directly reported to Defendant Scarlett.

13. Patients with MF often have an enlarged spleen and other debilitating constitutional, or systemic, symptoms that degrade quality of life. Accordingly, IMbark's co-primary endpoints sought to measure objectively whether imetelstat improved quality of life symptoms, namely: 1) the proportion of patients who achieve a ≥35% reduction in spleen volume, objectively assessed by imaging at 24 weeks; and 2) the proportion of patients who achieve a ≥50% reduction in ten other debilitating symptoms, at 24 weeks using a uniform scoring system. These co-primary endpoints were selected by Defendants because they were the endpoints used by Incyte Corporation to gain approval for Jakafi (ruxolitinib), then the only FDA-approved drug for treating MF.

14. Jakafi was approved by the FDA with data showing 42% of patients achieved a greater than 35% reduction in spleen volume at week 24 and achieved high levels of statistical significance for improvement in severe and debilitating symptoms. Almost all patients treated with Jakafi had some reduction in spleen volume, whereas the majority of patients receiving placebo had spleen growth. In addition, an early phase study of Jakafi, which, like IMbark, did not have a

control arm, showed 48% experienced spleen reductions of ≥35%, and rapid and lasting improvement in symptom score, with 58% of patients achieving a reduction in debilitating symptoms ≥50% at six months.

15. IMbark was not a blinded study, therefore, members of the JSC, through periodic data reviews, had access to objective data that showed whether patients on imetelstat met the study's co-primary endpoints.

16. IMbark had 14 secondary endpoints to measure other patient responses to imetelstat, including overall survival. Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm, and as a result, this endpoint was unreliable due to variability in patient selection and baseline patient health conditions, and as a result, could be biased and overstate or understate treatment efficacy.

17. In October 2016, the last patient enrolled in IMbark, with approximately 100 patients enrolled. Patients in IMbark were followed for 24 weeks after their last treatment, meaning objective data determining the proportion of patients that met the two co-primary endpoints was available in or around April 2017.

18. Geron senior executives, Behrs and Grethlein, as members of the JSC, reviewed data from IMbark in October 2016 and April 2017. The data were not publicly disclosed to investors at the time the JSC reviewed them.

19. The results of the IMbark study showed that imetelstat was not effective in improving quality of life because the vast majority of patients in the IMbark study had failed to meet the trial's co-primary endpoints at week 24. 90% of patients did not experience a reduction in spleen volume of ≥35%, and 68% did not experience a reduction in debilitating symptoms of ≥50%. No patient experienced a complete remission. In sum, the results of IMbark showed imetelstat did not produce the robust efficacy outcomes seen in studies of Jakafi, or the unprecedented and durable results seen in the earlier pilot study of MF patients taking imetelstat.

20. The material adverse results doomed Geron's partnership with Janssen because Janssen would decide whether to continue to license imetelstat based, in material part, on the results

of the two primary endpoints in the IMbark trial and the vast majority of IMbark patients had failed to meet those endpoints.

21. Following the JSC's review of the IMbark data in 2016 and 2017, instead of disclosing IMbark's material, adverse results, Defendant Scarlett falsely stated that Defendants observed "encouraging trends in the efficacy data" and "outcomes measures" that included "a range of spleen volume reductions" and "decreases in total symptom scores."

22. In March 2018, before the start of the Class Period, Geron senior executives, Behrs and Grethlein, as members of the JSC, again reviewed the IMbark study data. During the Class Period, while Defendant Scarlett knew of, or disregarded with at least deliberate recklessness, the material, adverse results of the IMbark study, he ignored those material, adverse results which showed that imetelstat was not effective. Instead of disclosing that the vast majority of patients in IMbark failed to meet the two primary endpoints, Defendant Scarlett falsely represented that the IMbark data results reviewed in March 2018 "remain consistent with prior data reviews." This was not true, as the IMbark study data did not show "encouraging trends in the efficacy data" because the two primary endpoints, which were the most important clinical outcomes being studied in IMbark, were not met for the vast majority of IMbark study patients. Moreover, there were zero complete remissions.

23. Further, during the Class Period, Defendants announced purportedly positive efficacy data about IMbark's median overall survival rate, one of 14 secondary, much less important endpoints in the IMbark study. Overall survival measures are how long patients taking the drug live after starting treatment. Median overall survival is the point in time during a study when 50% of the patients are still alive, and 50% have died. The longer it takes to reach median overall survival, the longer a majority of the patients in the study are living, which may indicate drug efficacy. Defendants repeatedly represented that "with a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm" in the IMbark study. Not having reached the median overall survival at 19 months appeared to be positive because it indicated that at least 50% of the patients would likely live longer than 19 months. Even assuming, *arguendo*, that imetelstat showed an improvement in overall survival (which was

dubious because there was no control group in IMbark), it was misleading for Defendants to represent that patients might see an increase in survival without disclosing that the IMbark data showed that 90% of patients did not experience a reduction in spleen size of ≥35%, and 68% of patients did not experience a reduction in symptoms of ≥50%, the two key primary endpoints and the most important clinical outcomes being studied in IMbark.

24. Based on the data and work performed on IMbark, Defendant Scarlett falsely represented that development of imetelstat had been "derisked," creating the misimpression that the data from the IMbark study showed imetelstat was effective in reducing spleen size and severe and debilitating symptoms, caused improved quality of life, and that the IMbark results weighed in favor of Janssen extending its licensing agreement. In truth, the data from the IMbark study showed imetelstat was not effective in reducing spleen size or reducing severe symptoms for the vast majority of patients, material facts which materially increased the risks attendant to the imetelstat program, rather than derisking the imetelstat program.

25. Defendant Scarlett's misleading representations caused Geron shares to trade at artificially inflated prices, and Defendants, knowing that the material, adverse results of the IMbark study put Geron's collaboration with Janssen in jeopardy, took full advantage of Geron's inflated stock price by selling more than $84 million of its common stock in at-the-market offerings during the period April through July 2018.[1] Moreover, in August 2018, Stephen Rosenfield ("Rosenfield"), Geron's Executive Vice President, General Counsel and Corporate Secretary, exercised 1,362,250 options to purchase Geron shares and sold 100% of the shares he acquired for gross proceeds of over $6.1 million, and in September 2018, Robert J. Spiegel ("Spiegel"), a Geron director, sold over $1.1 million in Geron stock.

26. On September 27, 2018, before the market opened, Defendants issued a press release disclosing the material, adverse results of the IMbark study. Not coincidentally, Defendants further announced that Janssen had decided to terminate its partnership with Geron. On September 27,

[1] An at-the-market offering is a secondary offering of stock through which newly issued shares are sold over time into the secondary trading market through a designated broker-dealer at prevailing market prices.

2018, Geron shares declined from a closing price on September 26, 2018 of $6.23 per share, to close at $2.31 per share, a decrease $3.92 per share or over 62%, on massive trading volume of over 84 million shares. The following day, Geron shares declined an additional $0.55 per share, or approximately 24%, on heavy volume of over 45 million shares traded.

27. Geron shares have not recovered, closing at $1.79 per share on August 19, 2020.

## III. JURISDICTION AND VENUE

28. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by SEC, 17 C.F.R. § 240.10b-5. Jurisdiction for this Court is conferred over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

29. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. In addition, Defendants reside and/or transact business in this District. The Company maintains its corporate headquarters in this District.

30. In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## IV. PARTIES

31. Plaintiff purchased Geron common stock on the public market during the Class Period as described in the Certification attached hereto, and suffered damages as a result of the violations of the federal securities laws alleged herein.

32. Defendant Geron is a biopharmaceutical company that is incorporated in Delaware and has its principal executive offices in Menlo Park, California. Geron’s common stock is traded under the symbol GERN on the NASDAQ, an efficient market. According to Geron’s filings with the SEC, as of March 7, 2018, there were 160,654,027 shares of the Company’s common stock outstanding, and as of October 25, 2018, there were 186,348,066 shares of the Company’s common stock outstanding.

33. Defendant Scarlett was the Company's President and CEO and a member of the Company's board of directors throughout the Class Period. He made materially false and misleading statements and omitted material facts in Geron's SEC filings, press releases and on public conference calls with analysts and investors, and at investor conferences during the Class Period. Defendant Scarlett, as a senior executive and director of Geron, acted within the scope of his authority and as an agent of Geron during the Class Period

34. During the Class Period, Geron had only approximately 18 employees, and Defendant Scarlett ran the Company as a hands-on manager overseeing Geron's operations. Defendant Scarlett had intimate knowledge about core aspects of Geron's financial and business operations, as imetelstat was the Company's only developmental drug candidate. He was also intimately involved in deciding which disclosures would be made by Geron. Because of his position and access to material non-public information available to him from Geron's representatives on the JSC, Defendant Scarlett knew, or disregarded with at least deliberate recklessness, that the material, adverse results of the IMbark study had not been disclosed to, and were being concealed from, the public, and that the false representations, which were being made, were then materially false and misleading. Defendant Scarlett, because of his position with Geron, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual investors. He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## V. BACKGROUND

35. Geron is a clinical stage biopharmaceutical company developing imetelstat to treat cancers that affect the blood, bone marrow and lymph nodes, such as MF and myelodysplastic syndromes ("MDS"). Imetelstat was Geron's sole product candidate.

### A. Geron's Collaboration and License Agreement with Janssen

36. In or around 2014, imetelstat was in early-phase clinical development for treatment of patients with MF and MDS. According to Geron, results of an early clinical "Pilot Study"

indicated that imetelstat had a disease-modifying activity in MF, produced “unprecedented and durable” remissions, and provided evidence that imetelstat’s mechanism of action inhibited growth of cancer cells. In the pilot study, 39% of patients with enlarged spleens achieved reduction in spleen size of ≥50%, and symptom responses of ≥50% were observed in 77% of patients. Furthermore, over 23% experienced a complete or partial remission, and another 18% experienced clinical improvements, for a total of over 40% of patients experiencing a complete or partial remission, or clinical improvement. Defendant Scarlett described these results as “unprecedented” and “durable”.

37. When a treatment completely eliminates cancerous cells that could be measured or seen on a test, it is referred to as a complete response or complete remission. A partial response or partial remission means the cancer partly responded to treatment, often defined as at least a 50% reduction in measurable cancerous cells.

38. On November 13, 2014, Geron and Janssen entered into the Collaboration and License Agreement. Under the CLA, Janssen was granted the exclusive rights to develop and commercialize imetelstat worldwide for all indications in oncology, including MF.

39. Geron received a $35 million upfront payment from Janssen, and was eligible for up to $900 million for the achievement of certain development, regulatory and commercial milestones, as well as royalties on worldwide net sales.

40. Under the CLA, development of imetelstat proceeded under a mutually agreed clinical development plan, which was expected to include Phase 2 studies in MF and MDS as initial studies, and additional registration studies in MF and MDS, and exploratory Phase 2 studies for treatment of related diseases. Geron expected the initial Phase 2 study in MF to be initiated in mid-2015, followed later by a Phase 2/3 MDS study. Development costs for the MF and MDS studies would be shared between the companies on a 50/50 basis.

41. The CLA provided that Janssen would make a decision whether to maintain its licensing rights under the CLA. Continued development of imetelstat would depend on an analysis of the MF Phase 2 study. If Janssen opted to continue, Geron would receive a $65 million milestone payment.

### B. The CLA's Joint Geron-Janssen Governance Committees

42. Under the CLA, certain regulatory and development activities would be managed through a joint governance structure, with Janssen responsible for operational implementation of these activities. The CLA established the Joint Steering Committee and Joint Development Committee (the "Governance Committees"), which, pursuant to the CLA, was comprised of three senior Geron executives and three Janssen executives.

43. Geron's representatives on the JSC included Behrs, Geron's Executive Vice President, Business Development and Portfolio & Alliance Management, Grethlein, Geron's Executive Vice President, Development and Technical Operations. Behrs' work on the Governance Committees was resolving issues encountered and assessment of data sets based on interim data reviews. Similarly, Grethlein played a key leadership role as a member of the Governance Committees, including evaluation of development and regulatory options for the imetelstat clinical programs, particularly in response to interim data reviews.

44. For Janssen, Dr. Aleksandra Rizo ("Rizo") was a Senior Director, Compound Development Team Leader at Janssen for all Phase 1 myeloid assets, and Global Clinical Leader for all myeloid assets, including imetelstat. Rizo had oversight and leadership responsibilities for overall clinical development strategy, study designs, execution and data interpretation for all related programs. In addition, Rizo was a core member of Janssen's Hematology Strategy Team, and in this role, participated and led diligence projects in hematology.

45. The JSC oversaw and monitored IMbark, and reviewed the results and progress, including periodic reviews of IMbark study data, clinical, regulatory and safety data, results, reports and analyses. The JSC members would meet at least quarterly, and other participants in the JSC's work included members of working groups from Geron and Janssen.

46. The meetings of the JSC were chaired by Janssen. The chairperson set agendas for meetings in advance, and Geron and Janssen rotated the responsibility for preparing draft minutes of each meeting for review. The chairperson issued final minutes signed or otherwise approved in writing (such as via an electronic signature) by a Janssen representative and a Geron representative.

47. According to Defendant Scarlett during a conference call on November 14, 2014 announcing the CLA, Defendants would play "an active role on the joint steering committee and other governance committees" and would participate "fully in the governance of the joint development and commercial efforts of the partnership over the life of the agreement." Although Janssen would have operational responsibility, Defendant Scarlett stated that "very clearly we'll continue to be very much in the flow both of data and also decision-making."

48. Similarly, on a conference call with analysts and investors on March 3, 2015, Defendant Scarlett stated:

> . . . we plan to continue to diligently represent Geron's interest on the imetelstat joint development committee and joint steering committee, as well as on several joint working groups, operating under the purview of the joint steering committee.
>
> Through these committees, our responsibilities [] include active review and approval of all clinical studies, manufacturing plans and budgets, and leading the filing, prosecution, and maintenance of the imetelstat global patent portfolio. For example, work with Janssen is ongoing on the protocol for the new Phase II MF trial [IMbark].

49. On May 9, 2017, Defendant Scarlett further explained Geron's role on the JSC:

> So maybe I can help first by saying what does that Joint Steering Committee actually do, and the answer is that, that is the decision-making body that when we talk about things that have been decided. . . . the Joint Steering Committee which consists of senior Janssen executives and senior Geron executives . . . look at all the data and say yes, we agree. They usually are looking at the work of other subcommittees. They have multiple subcommittees that, if you will, report up to the Joint Steering Committee. . . . So anytime you see that the Joint Steering Committee has decided, determined, affirmed, whatever the words are, that means that Janssen is fully participated in that, fully agrees.

### C. IMbark Was a Phase 2 Clinical Study of Imetelstat for MF

50. In or around April 24, 2015, Janssen and Geron initiated the IMbark study, a Phase 2 "Study to Evaluate Activity of 2 Dose Levels of Imetelstat in Participants With Intermediate-2 or High-Risk Myelofibrosis (MF) Previously Treated With Janus Kinase (JAK) Inhibitor". The IMbark study was designed to evaluate the activity of imetelstat in patients with high-risk MF who have relapsed after, or did not respond to other, treatment (refractory), and to evaluate the findings in the earlier pilot study.

51. In July 2015, IMbark opened to patient enrollment.

52. IMbark's co-primary efficacy endpoints measured whether imetelstat improved patient quality of life and alleviated symptoms—whether spleen volume and other debilitating symptoms were reduced. Spleen volume reduction is defined as the proportion of patients who achieve ≥ 35% reduction in spleen volume from baseline at the week 24 visit, which could be objectively measured by imaging scan. Total symptom reduction is defined as the proportion of patients who have ≥ 50% reduction in total symptom scores from baseline at the week 24 visit, based on patient-reported severity of various symptoms associated with MF.

53. Defendants selected spleen volume reduction and reduction in symptoms as the two primary endpoints to measure the efficacy of imetelstat because they were used in connection with FDA approval of Jakafi. At the time IMbark was initiated, Incyte Corporation's Jakafi (ruxolitinib), was the only FDA-approved drug for adults with certain types of MF. To gain FDA approval, Incyte studied spleen reduction and symptom reduction. In the Phase 3 study data for Jakafi—which Defendant Scarlett stated were "impressive"—42% of patients achieved a greater than 35% reduction in spleen volume (compared to 1% of patients in control group taking a placebo), and achieved high levels of statistical significance for improvement in severe and debilitating symptoms.

54. Defendant Scarlett repeatedly stated that IMbark's co-primary endpoints of spleen volume reduction and total symptom score were key to establishing imetelstat's efficacy in treatment of patients suffering from MF. During a conference call with analysts and investors on April 10, 2017, Defendant Scarlett stated that "we chose these endpoints because the only precedent for regulatory approval in MF was developed from previous trials in which ruxolitinib [(Jakafi)], a JAK inhibitor, was used to treat front-line MF patients."

55. During an August 3, 2016 conference call with analysts and investors, Defendant Scarlett reiterated the importance of the co-primary end points selected for the IMbark study in response to an analyst's question:

> . . . the reason that we picked splenomegaly [abnormal enlargement of the spleen] -- spleen response rate and total symptom response rate was really because those are the approved endpoints so far for ruxolitinib [(Jakafi)]. And since these patients are all refractory or relapsed from JAK inhibitor

> therapy, that made a lot of sense. It is a regulatorily approved endpoint. . . . I think that just makes sense from the precedent information that's available.

56. IMbark's 14 secondary endpoints included complete remission or partial remission, and clinical improvement. IMbark's fifth secondary endpoint was overall survival. Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm and overall survival may be unreliable due to variability in patient selection and baseline patient conditions, and may overstate or understate treatment efficacy.

57. On May 9, 2017, at the Company's annual shareholder meeting, Defendant Scarlett stated IMbark was "not designed to answer whether there was a quantitative overall survival benefit. To do that, we required . . . a control group."

**D. The JSC Reviews IMbark Trial Data**

58. For each of the JSC's reviews of IMbark data, Behrs played a key leadership role as a member of the Governance Committees to ensure active monitoring of progress versus key program goals, including the data reviews in October 2016, April 2017, and the March 2018 data review. Similarly, Grethlein played a key leadership role as a member of the Governance Committees.

59. Behrs and Grethlein reported the results of IMbark and JSC's observations of the IMbark trial data to Defendant Scarlett.

60. On September 12, 2016, Defendant Scarlett conducted a conference call with analysts and investors during which he provided an update on IMbark based on an interim review of IMbark data. While Defendant Scarlett declined to discuss specific data results, he described the data results as showing "encouraging trends in the efficacy data" that "were observed." In response to an analyst question for details about the encouraging trends, Defendant Scarlett responded:

> . . . we're not talking about the specifics of any of these results in terms of, you know, various outcomes and so forth. We've always stated that we wouldn't be doing that, we'd just be talking about outcomes of the trial. So, I don't think I'm in a position to really make much more of a comment about that other than to say that obviously they were encouraging trends,

> you know, in progressing towards, you know, towards the assessment of the co-primary end points, [specifically] the symptoms reduction.
>
> But beyond that, I don't think I would – I'm in a position to talk about that.

61. In October 2016, the last patient was enrolled in IMbark.

62. Because spleen volume reduction and total symptom scores were measured after patients had been taking the drug for 24 weeks, and the last patient enrolled in IMbark in October of 2016, the objective data regarding the co-primary endpoints for all patients enrolled in IMbark, which showed that 90% of patients failed to experience a spleen volume reduction of ≥35%, 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, and that there were zero complete remissions, were available starting in or around April 2017.

63. On April 10, 2017, during a conference call with analysts and investors, Defendant Scarlett discussed a second JSC internal review of IMbark data. Defendant Scarlett stated that the JSC stated that "spleen volume response rate observed to date was less than that reported in front-line MF patients treated in trials with other drugs" but did not disclose any IMbark data or the material, adverse data results. Defendant Scarlett, instead, falsely stated "activity within multiple outcome measures was observed with imetelstat treatment, which suggests clinical benefit in this relapsed or refractory MF population. These outcome measures included a range of spleen volume reductions, decreases in total symptom scores and improvements in hematologic parameters such as anemia and peripheral blood counts."

64. In March 2018, before the start of the Class Period, the JSC conducted a third review of the IMbark data based on the data as of January 2018, over 64 weeks after the last patient enrolled in IMbark. All of the patients in the IMbark study had taken imetelstat so the results were not "blinded," meaning that the JSC members could see overall spleen volume reduction and total symptom scores for patients who participated in IMbark.

65. Based on the March 2018 review, Behrs and Grethlein knew, or disregarded with at least deliberate recklessness, that the IMbark study produced material, adverse results, and reported this to Defendant Scarlett. The IMbark trial results indicated that imetelstat was not effective in treating MF and that it did not have a disease modifying effect. Indeed, 90% of patients failed to experience a spleen volume reduction of ≥35, and 68%, had failed to experience a reduction in

debilitating symptoms of ≥50%. Further, just one patient experienced a partial response and there were zero complete responses, for an overall response rate of just 1.7%, demonstrating that imetelstat did not have a disease modifying effect in contrast to the results of the earlier pilot study.

66. The material, adverse results of IMbark based on the March 2018 review of the study data would be reflected in the draft and final minutes of the JSC.

67. Behr and Grethlein, as members of the JSC and as senior executives and officers of Geron who acted within the scope of their authority and as agents of Geron during the Class Period, reported the JSC's March 2018 observations and the IMbark study data to Defendant Scarlett.

68. By April 2018, Janssen began conducting its primary analysis of the IMbark data. The timing of Janssen's decision whether to continue licensing imetelstat was determined by the completion of the primary analysis of IMbark, which Defendants expected by September 30, 2018.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

69. During the Class Period, Defendants' representations to investors were materially false and misleading at the time they were made, and Defendants failed to disclose material facts that they had a duty to disclose in order to make the statements made by Defendants, in light of the circumstances under which they were made, not misleading.

70. On March 16, 2018, after the market closed, Defendant Scarlett caused Geron to file its annual report for the year ended December 31, 2017 with the SEC on Form 10-K ("2017 10-K"). Defendant Scarlett signed the 2017 10-K. Defendants for the first time described "overall survival" as a "key secondary endpoint" and stated, in part, the following:

> <u>Current Status of IMbark</u>
>
> In March 2018, Janssen completed a third internal data review of IMbark, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, including for survival, and the JSC made the following observations and implemented the following actions: . . .
>
> - <u>**Outcome measures for efficacy, including spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews**</u>.

- **With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm**.

* * *

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

. . . Janssen completed internal data reviews in September 2016, April 2017 and March 2018. **In these data reviews, activity within multiple outcome measures was observed with imetelstat treatment that suggest potential clinical benefit in patients with MF who are relapsed after or refractory to prior treatment with a janus kinase, or JAK, inhibitor . . . .**"[2]

71. Defendants' representation that "Outcome measures for efficacy, including spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews" was materially false and misleading because, in contrast to "prior data reviews" that Defendant Scarlett stated showed "encouraging trends in the efficacy data" regarding "assessment of the co-primary endpoints", and outcomes including "spleen volume reduction [and] decreases in total symptoms scores", the IMbark study as of the March 2018 data review showed that imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, which were the two primary endpoints IMbark studied and the most significant clinical outcomes, and there were zero complete remissions.

72. Defendants' representation that with a "median follow-up of approximately 19 months, the overall survival has not been reached" indicated that the overall survival could be longer than 19 months, an apparently positive result that imetelstat was effective in improving overall survival, the fifth of IMbark's 14 secondary endpoints. However, Defendant Scarlett misled investors by failing to disclose the negative data indicating that imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%.

[2] The statements quoted in this section in **underlined, bolded** text are materially false and misleading for the reasons set forth herein. Additionally, as specifically indicated below, many of the identified statements are alleged to have been false and misleading by omission. Thus, additional text is provided for context and in support of these statements' allegedly omissive nature.

When Defendant Scarlett announced positive information concerning overall survival results from the IMbark study, he had a duty under the federal securities laws to disclose the material, adverse information that cut against the positive information. Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed because it was misleading for Defendants to represent that imetelstat might be effective in increasing overall survival without disclosing, however, that the IMbark data showed that imetelstat was not effective in reducing spleen size and MF's debilitating symptoms, and that patients' quality of life did not improve for the vast majority of patients, which were the two primary endpoints and the most significant clinical outcomes IMbark studied.

73. Defendants' representation that the March 2018 data review "suggest potential clinical benefit in patients with MF who are relapsed after or refractory to prior treatment with a janus kinase, or JAK, inhibitor" was materially misleading because Defendants' representation gave investors the false impression that the March 2018 data provided MF patients with clinical benefit at a time when Defendants knew, or disregarded with deliberate recklessness, that the IMbark data showed imetelstat was not effective in providing the key clinical benefits being studied in the IMbark study, as the vast majority of patients did not experience reduction in spleen size, or in debilitating symptoms.

74. The 10-K was materially false and misleading for the additional reason that it violated, Item 303 of SEC Regulation S-K, 17 C.F.R. 929.303 ("Item 303"), which required the 2017 10-K's Management Discussion and Analysis ("MD&A") section to disclose: (i) unusual events, transactions or significant economic changes that materially affected the amount of Geron's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations. The material, adverse results from the IMbark study and the impact that the adverse results would have on Janssen's decision whether to continue the CLA were known uncertainties that Defendants reasonably expected to have a material impact on the Company's revenues (and, in fact, did) that Defendants failed to disclose in violation of Item 303.

75. The 2017 10-K contained generic warnings of future "risks and uncertainties that **may** have a material adverse effect" on Geron's business. For example, the 2017 10-K provided future risk warnings, including:

- "if imetelstat fails to meet criteria determined by Janssen to support an affirmative Continuation Decision, or for any other reason, Janssen **may** discontinue the imetelstat program and terminate the Collaboration Agreement";
- "Even if Janssen obtains longer-term efficacy and safety data for IMbark, Janssen . . . **may** determine that such data do not show an adequate improvement in survival to support further development and potential regulatory approval for imetelstat in relapsed or refractory MF patients, which we expect would result in a decision by Janssen to discontinue IMbark and the imetelstat program and terminate the Collaboration Agreement";
- "Current clinical trials of imetelstat being conducted by Janssen, including IMbark . . . **may** fail to demonstrate sufficient safety and efficacy of imetelstat to warrant further development of the drug, which could prevent or further delay regulatory approval and commercialization of imetelstat"; and
- "the potential disease-modifying activity observed through molecular responses in the ET trial and partial or complete remissions observed in the Pilot Study **may** not be seen in current or future clinical trials of imetelstat."

76. Defendants' warnings about potential, future risks failed to reveal that the risks had already materialized. At the time Defendants warned of these potential, future risks, Defendants knew of, or disregarded with at least deliberate recklessness, the material, adverse results of the IMbark study and that the data Defendants and Janssen had as of March 2018 showed that imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, and no patient experienced a complete remission. While Defendants warned that that Janssen may discontinue the imetelstat program and the CLA if imetelstat fails to meet Janssen's criteria, Defendants already were aware, or disregarded with deliberate recklessness, that the IMbark study's data showed that imetelstat failed to meet the co-primary endpoints for the vast majority of patients, material factors that Defendants told investors Janssen was considering in determining whether to continue licensing imetelstat.

77. Also on March 16, 2018, after the market closed, Defendant Scarlett caused Geron to issue a press release, which was filed with the SEC on Form 8-K, disclosing the Company's financial results for the fourth quarter and year ended December 31, 2017, and recent events. The press release repeated the false representations that based on the March 2018 review of IMbark data "Outcome measures for efficacy, including spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews" and "With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm," which were materially false and misleading for the reasons delineated above in paragraphs 71 and 72, respectively.

78. On Monday, March 19, 2018, before the market opened, Geron held a conference call with investors and analysts to discuss the Company's fourth quarter and annual results. On that call, Defendant Scarlett discussed the current IMbark study data and the JSC's observations concerning the current data. Defendant Scarlett represented that a review of the clinical trial data showed median overall survival for all the patients had not yet been reached after a follow-up of 19 months, meaning the final, median overall survival might be longer, which Defendant Scarlett represented was an improvement to overall survival compared to "real world" patient survival:

> This morning, I'll start my remarks with a summary of the results from the latest internal data review conducted by Janssen on the IMbark and an update on the projected timing of the protocol-specified primary analysis for IMbark and the subsequent potential continuation decision from Janssen. . . . **<u>with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm.</u>**
>
> * * *
>
> The assessment of survival is important because we believe that a new treatment that could confirm improved survival would represent a meaningful clinical outcome for patients who are relapsed or refractory to the only approved MF treatment today. As experience with JAK inhibitors increases, both in the real world and clinical trial settings, we know that the majority of MF patients fail or stop JAK inhibitor treatment and data from recent literature and other sources suggest that the survival of these patients is limited.
>
> For example, an analysis of real world data conducted by Janssen and presented at ASH in 2016 reviewed treatment patterns and outcomes of MF patients from 2 U.S. medical claims databases. This analysis suggested

> that once patients fail or discontinue ruxolitinib, mean overall survival is approximately 7 months. Three other recently published and independent papers describing outcomes of MF patients after discontinuing JAK inhibitor treatment, either in the context of a clinical trial or through commercial supply, estimated median overall survival of approximately 14, 15 or 16 months, respectively. **Thus, imetelstat potentially could address a significant unmet medical need if its use is associated with survival that is meaningfully longer than 14 to 16 months.**

79. Defendant Scarlett's representations that the IMbark data showed a potential improvement in overall survival compared to "real world data" misled investors by failing to disclose the negative data indicating that imetelstat did not improve quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%. When Defendant Scarlett announced purportedly positive information concerning overall survival results from the IMbark study, he had a duty under the federal securities laws to disclose the material, adverse information that cut against the positive information. Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed because it was misleading for Defendants to represent data that imetelstat might be effective in increasing overall survival, a secondary, much less important endpoint, without disclosing, however, that the IMbark data showed that imetelstat was not effective in reducing spleen size and MF's debilitating symptoms, which were the two primary endpoints and the most significant clinical outcomes.

80. Furthermore, during the March 19, 2018 conference call, Defendant Scarlett represented that IMbark's "outcome measures for efficacy, including spleen volume responses and reductions in total symptom score remain consistent with the prior data reviews."

81. Defendant Scarlett's representation was materially false and misleading because, in contrast to "prior data reviews" that Defendant Scarlett stated showed "encouraging trends in the efficacy data" and "a range of spleen volume reductions, decreases in total symptoms", the IMbark study data as of the March 2018 data review were not encouraging because they showed that imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in

severe, debilitating symptoms of ≥50%, which were the two primary endpoints being studied in IMbark and the most significant clinical outcomes.

82. As a result of Defendants' false representations, the price of Geron's common stock increased, from a closing price on March 16, 2018 of $3.37 per share, to close at $4.34 per share on March 19, 2018, the next trading day, an increase of $0.97 per share, or approximately 29%, on heavier than usual volume of more than 26 million shares traded. This increase was the result of artificial inflation caused by Defendants' misleading statements.

83. On March 27, 2018, after the close of trading, Defendant Scarlett made a presentation at the 17th Annual Needham Healthcare Conference in New York City. At the presentation, he introduced a slide entitled "IMbark Internal Data Reviews, Findings to Date." The slide, which was also posted on Geron's website, purported to summarize "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018." It represented, "**Activity within multiple outcome measures observed, suggesting clinical benefit in R/R MF"** including a "**Range of reductions in spleen volume**" and "**Decreases in Total Symptoms Score**." The slide also represented, "**Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)**."

84. Defendant Scarlett's representation that the IMbark data showed "**Activity within multiple outcome measures observed, suggesting clinical benefit in R/R MF**" including a "**Range of reductions in spleen volume**" and "**Decreases in Total Symptoms Score**" was materially false and misleading because Defendant Scarlett concealed the material adverse results of the IMbark study and misrepresented the IMbark outcomes concerning the two key primary endpoints. As of the March 2018 data review, the IMbark data showed that 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, which were the two primary endpoints IMbark studied and the most significant clinical outcomes. These material, adverse results stood in stark contrast to the robust outcomes produced by Jakafi and in the earlier pilot study on imetelstat. Furthermore, Defendant Scarlett's representation that "**Median OS not reached in either dosing arm (with**

**<u>median follow-up of ~19 months at January 2018 data cut)</u>**" was materially false and misleading for the reasons delineated above in paragraph 72.

85. In April 2018, Defendant Scarlett caused Geron to sell 12,418,318 shares of common stock through an at-the-market offering, resulting in net cash proceeds to the Company of approximately $46,098,000 after deducting sales commissions and offering expenses payable by the Company. The shares were sold under a 2015 Sales Agreement between Geron and MLV & Co. LLC, under which Geron could elect to issue and sell shares of its common stock having an aggregate offering price of up to $50 million. These sales completed the sale of the remaining common stock subject to the 2015 Sales Agreement.

86. On May 10, 2018, Defendant Scarlett caused Geron to issue a press release that disclosed its financial results for the quarter ended March 31, 2018. The May 10, 2018 press release represented the following:

> "As we have previously announced, we expect Janssen to make its decision about whether to continue their development of imetelstat by the end of third quarter of 2018," said John A. Scarlett, M.D., Geron's President and Chief Executive Officer. "Regardless of Janssen's future decision, **<u>we believe imetelstat warrants further development because</u>** of the activity observed in lower risk MDS patients from Part 1 of IMerge as presented at ASH last December, and **<u>the evolving overall survival in relapsed or refractory MF patients observed in IMbark</u>**."

87. Defendant Scarlett's representations were materially false and misleading. While Defendants Scarlett may have believed that imetelstat warranted further development because of a purportedly positive data concerning overall survival, when disclosing such purportedly positive data, he had a duty to disclose the material, adverse data of the IMbark study in order to make his representations not misleading. Instead of disclosing that 90% of IMbark patients failed to experience a ≥35% reduction in spleen volume and 68% of patients failed to experience ≥50% reduction in debilitating symptoms, which were the two primary endpoints and the most significant clinical outcomes in the IMbark study, Defendant Scarlett instead chose to misleadingly disclose the purportedly positive result that imetelstat improved overall survival, the fifth of IMbark's 14 secondary endpoints. When Defendant Scarlett announced positive data concerning overall survival results from the IMbark study, he had a duty under the federal securities laws to disclose

the material, adverse data results of the IMbark study that cut against the positive data. Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed, in violation of the federal securities laws. Even assuming, *arguendo*, that the IMbark data showed an improvement in survival, it was misleading for Defendants to represent that patients might see an increase in survival without disclosing the material, adverse data that 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, and no patient experienced a complete remission.

88. On May 10, 2018, Defendant Scarlett caused Geron to file the Company's quarterly report on Form 10-Q with the SEC ("Q1 2018 10-Q"). Defendant Scarlett signed a certification pursuant to Section 302(A) of the Sarbanes-Oxley Act that certified he reviewed the Q1 2018 10-Q.

89. The MD&A section of Q1 2018 10-Q referred to overall survival as a "key" secondary endpoint and represented that "**The JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either dosing arm**."

90. Defendants' representations were materially false and misleading for the reasons delineated above in paragraphs 72 and 74.

91. The Q1 2018 10-Q incorporated by reference and repeated the risk factors warning of potential, future risk set forth in the 2017 10-K in paragraph 75.

92. Defendants purported risk warnings were materially false and misleading for the reasons delineated above in paragraph 76.

93. On May 15, 2018, Geron held the Company's 2018 annual shareholder meeting ("2018 Shareholder Meeting") and conducted a conference call with shareholders. Defendant Scarlett, Behr, Grethlein, Rosenfield and Spiegel participated in the 2018 Shareholder Meeting. During the 2018 Shareholder Meeting, Defendant Scarlett represented the following:

> In March of 2018, we announced that as of January of this year, **the median overall survival had not yet been reached in the trial** and we

> have not received any additional information about overall survival since then.
>
> * * *
>
> Before considering imetelstat in relapse, refractory MF, we will want to see the data from the IMbark primary analysis. **<u>We do believe the observations made to date suggest activity of the drug and potential clinical benefit in MF. . . .</u>**

94. Defendant Scarlett's representations that "the median overall survival had not yet been reached" in the IMbark study was materially false and misleading for the reasons delineated above in paragraph 72. Furthermore, Defendant Scarlett's representations that "[w]e do believe the observations made to date suggest activity of the drug and potential clinical benefit in MF" were materially false and misleading because, while Defendant Scarlett may have believed the IMbark data suggested potential clinical benefit, the IMbark data at that time, in fact, showed imetelstat was not effective improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, which were the two primary endpoints and the most significant clinical outcomes, and there were zero complete remissions. Defendant had a duty under the federal securities laws to disclose the material, adverse information and data that cut against the positive information and data. Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed because it was misleading for Defendants to represent that the IMbark data "suggest activity of the drug" and "potential clinical benefit be effective in increasing overall survival" without disclosing, however, that the IMbark data showed that for the vast majority of patients, imetelstat was not effective in reducing spleen size and MF's debilitating symptoms, that patients' quality of life did not improve, and that there were zero complete remissions.

95. On May 18, 2018, Geron entered into an At Market Issuance Sales Agreement (the "May 2018 Sales Agreement") with B. Riley FBR, Inc. ("B. Riley FBR"), pursuant to which the Company could issue and sell shares of its common stock having an aggregate offering price of up to $100 million from time to time through B. Riley FBR as its sales agent. Also on May 18, 2018, Geron filed a prospectus supplement with the SEC on Form 424B5 for the sale of up to $100 million

(the "May 18 Prospectus"). The May 18 Prospectus incorporated by reference the 2017 10-K, which included the representations alleged above in paragraphs 70 (representations concerning IMbark data outcomes), 74 (representations concerning IMbark data in MD&A), and 75 (future risk warnings), which were materially false and misleading for the reasons delineated above in paragraphs 71-74, 76. The May 18 Prospectus also incorporated by referenced the Q1 2018 10-Q, which included the representations alleged above in paragraphs 89 (representations concerning IMbark data in MD&A), and 91 (future risk warnings), which were materially false and misleading for the reasons delineated in paragraphs 90 and 92, respectively.

96. Between May 18 and June 30, 2018, Geron sold 9,447,026 shares of Geron common stock through B. Riley FBR, Inc. in an at-the-market offering for $36,208,000 in net proceeds under the May 18 Prospectus and May 2018 Sales Agreement.

97. On July 10, 2018, Defendant Scarlett caused Geron to file an amended Registration Statement on form S-3/A with the SEC that was signed by Defendant Scarlett ("July 10 Registration Statement"). The July 10 Registration Statement incorporated by reference the 2017 10-K, which included the representations alleged above in paragraphs 70 (representations concerning IMbark data outcome), 74 (representations concerning IMbark data in MD&A), and 75 (future risk warnings), which were materially false and misleading for the reasons delineated above in paragraphs 71-74, 76. The July 10 Registration Statement also incorporated by referenced the Q1 2018 10-Q, which included the representations alleged above in paragraphs 89 (representations concerning IMbark data in MD&A), and 91 (future risk warnings), which were materially false and misleading for the reasons delineated in paragraphs 90 and 92, respectively.

98. On July 12, 2018, Defendant Scarlett caused Geron to file a prospectus on Form 424B5 with the SEC ("July 2018 Prospectus"). According to the July 12 Prospectus, "[a]s of the date of this prospectus, shares of our common stock having an aggregate offering price of up to $62,821,700 remained unsold under the [May 2018 Sales Agreement and May 18 Prospectus]. The common stock remaining available to be sold under the prior prospectus as of the date of this prospectus will no longer be offered and sold under the prior prospectus, but will instead be offered

and sold under [the July 2018 Prospectus]. Accordingly, we may offer and sell shares of our common stock having an aggregate offering price of up to $62,821,700 pursuant to this prospectus."

99. On July 31, 2018, Defendant Scarlett caused Geron to issue a press release that disclosed its financial results for the quarter ended June 30, 2018. Also on July 31, 2018, Defendant Scarlett conducted a conference call with analysts and investors during which he made the following representations:

> Next, IMbark and myelofibrosis or MF. As a reminder, IMbark is our Phase II trial in patients with Intermediate-2 or high risk MF, who have relapsed after or are refractory to prior treatment with a JAK inhibitor. In the second quarter of this year, Janssen initiated a protocol-specified primary analysis, which includes an assessment of overall survival using April 26 as a clinical cutoff date. The timing of Janssen's continuation decision is driven by the timing of the completion of the primary analysis of IMbark, and we continue to expect their decision by the end of the third quarter. In their decision-making process, we believe that Janssen will consider the totality of data from both clinical trials. For IMbark, we expect Janssen to focus on projected median overall survival because patients eligible for IMbark has few other treatment options. Since IMbark does not have a control arm, the assessment of overall survival can only be contextualized by looking at overall survival from other trials with similar MF patient populations, who have failed or been refractory to JAK inhibitor treatment. Janssen will make their own assessment whether they believe there is an adequate improvement in overall survival to warrant further development of imetelstat in relapsed refractory MF.
>
> * * *
>
> . . . From our perspective, **<u>we believe the imetelstat program has been derisked by the collaboration with Janssen as they have evaluated the drug in Phase II for both MDS and MF, which is when much of the derisking of clinical development is done.</u>**

100. Defendant Scarlett's representation that the imetelstat program had been "derisked" by Geron's collaboration with Janssen was materially false and misleading because the data from the IMbark study concerning the two primary endpoints showed imetelstat was not effective in improving patient quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, which were the two primary endpoints and the most significant clinical outcomes. The material, adverse results were a material, undisclosed risk to the imetelstat program that weighed against Janssen opting to continue its collaboration with Geron, and increased the risk to the imetelstat program under the CLA. While Defendant Scarlett may have believed the imetelstat program was

"derisked" as a result of the purportedly positive overall survival data, he had a duty under the federal securities laws to disclose the material, adverse information about IMbark's failure that cut against the positive data and that increased the risk to the imetelstat program. Defendant Scarlett's failure to comply with his duties gave Geron investors an impression of a state of affairs that differed in a material way from the one that actually existed.

101. On July 31, 2018, Defendant Scarlett caused Geron to file the Company's quarterly report on Form 10-Q with the SEC ("Q2 2018 10-Q"). Defendant Scarlett signed a certification pursuant to Section 302(A) of the Sarbanes-Oxley Act that certified he reviewed the Q2 2018 10-Q.

102. The MD&A section of Q2 2018 10-Q again referred to overall survival as a "key" secondary endpoint and represented that "**The JSC also concluded that as of the January 2018 data cut-off date, with a median follow up of approximately 19 months, median overall survival had not been reached in either dosing arm**."

103. Defendants' representations were materially false and misleading for the reasons delineated above in paragraphs 72 and 74.

104. The Q2 2018 10-Q incorporated by reference and repeated the risk factors warning of potential, future risks set forth in the 2017 10-K alleged in paragraph 75.

105. Defendants purported risk warnings were materially false and misleading for the reasons delineated above in paragraph 76.

106. Under the July 2018 Prospectus and May 2018 Sales Agreement, in July 2018 Geron sold 636,053 shares of Geron common stock for proceeds of $2,167,000.

107. On August 24, 2018, just weeks before the end of the Class Period, Rosenfield, exercised 1,362,250 options to purchase Geron shares at prices between $1.41 and $2.45 per share, and sold 100% of the shares he acquired at $4.51 per share for gross proceeds of over $6.1 million, and net proceeds of over $4.3 million. These transactions represented the sale of almost 100% of his Geron shares, including vested options. Rosenfield's sales were suspicious in timing and amounts. As Executive Vice President, General Counsel and Secretary he was in a position to know, or at least disregard with deliberate recklessness, that Defendants had been misleading

investors about the material, adverse IMbark study results. He had not sold any shares in the year before the start of the Class Period, and did not purchase any shares on the open market during the Class Period. Moreover, he suspiciously entered into a trading plan on July 13, 2018, during the Class Period and at a time that internally the Defendants and Geron's JSC members were aware of the material, adverse results of the IMbark study.

108. On September 13, 2018, just days before the end of the Class Period, Geron director Spiegel exercised 175,000 options to purchase Geron shares at prices between $1.10 and $5.29 per share, and sold 100% of the shares he acquired at $6.85 per share for gross proceeds of $1,198,750, and net proceeds of approximately $404,091. Spiegel's sales were suspicious in timing and amounts. As a director of Geron, he was in a position to know, or at least disregard with deliberate recklessness, that Defendants had been misleading investors about the IMbark study results. He had not sold any share in the year before the start of the Class Period, and did not purchase any shares on the open market during the Class Period. Moreover, he suspiciously entered into a trading plan on July 18, 2018, during the Class Period and at a time that internally the Defendants and Geron's JSC members knew of the material, adverse results of the IMbark study.

## VII. THE TRUTH BEGINS TO EMERGE

109. On September 27, 2018, before the market opened, Defendants disclosed the material, adverse results of the IMbark study when Defendant Scarlett caused Geron to issue a press release that stated in relevant part:

> **IMbark Protocol-Specified Primary Analysis Highlights**
>
> IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.
>
> The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks. Key secondary endpoints are safety and overall survival.

> ***For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%. No patients achieved complete remission, and one patient achieved partial remission.*** The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified. The most common adverse events were cytopenias. At the time of the primary analysis, median overall survival had not been reached after 23 months of median follow-up.

(Emphasis added).

110. Defendants also announced that Janssen had terminated its partnership with the Geron for the development of imetelstat.

111. The same day the full results were finally disclosed, an article on STAT News concerning Geron's disclosure stated in relevant part: "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis." The STAT News article characterized Defendant Scarlett's conduct a "bait-and-switch tactic":

> . . . The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms. ***Geron and Janssen were keeping these data hidden, even though they were readily available. Shifting attention to survival was a smokescreen.***
>
> On Thursday [September 27, 2018], we learned why. The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent."

(Emphasis added.)

112. As a result of these disclosures, the price of Geron's common stock dropped from a closing price on September 26, 2018 of $6.23 per share, to $2.31 per share, a decrease $3.92 per share or over 62%, on massive trading volume of over 84 million shares. The following day, Geron shares declined an additional $0.55 per share, or approximately 24%, on heavy volume of over 45 million shares traded. This decrease in the price of Geron's securities was a result of the artificial inflation caused by Defendants' misleading statements coming out of the stock price.

## VIII. LOSS CAUSATION

113. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Geron common stock and operated as a fraud or deceit on purchasers of Geron common stock. As detailed above,

when the truth about Geron's misconduct was revealed, the value of the Company's stock declined precipitously as the prior artificial inflation no longer inflated the stock's prices. The decline in the price of Geron shares were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's stock and the subsequent significant decline in the value of the Company's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

114. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the results of the IMbark study data, as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the prices of Geron's common stock to be artificially inflated. Plaintiff and other Class members purchased Geron stock at those artificially inflated prices, causing them to suffer damages.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

115. During the Class Period, Defendants had both the motive and opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in deliberately reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Geron common stock during the Class Period.

116. During the Class Period, Defendant Scarlett's misleading representations to investors caused Geron shares to trade at artificially inflated price, and Defendants took full

advantage of Geron's inflated stock price by selling more than $84 million of its common stock in at-the-market offerings during the period from April through July 2018. Moreover, in August 2018, Rosenfield, Geron's Executive Vice President, General Counsel and Corporate Secretary, exercised 1,362,250 options to purchase Geron shares and sold 100% of the shares he acquired for gross proceeds of over $6.1 million, and in September 2018, Spiegel, a Geron director, sold over $1.1 million in Geron stock.

## X. NO SAFE HARBOR

117. Geron's Safe Harbor" warnings accompanying any forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

118. Defendants are liable for any false or misleading FLS pleaded herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Geron who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

119. In addition, the FLS were contradicted by existing, undisclosed material negative facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

120. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiff and other members of the Class purchased Geron common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

121. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Here, the Class' claims are also grounded on Defendants' failure to disclose material adverse information regarding the material, adverse data results of the IMbark study—which were known to Defendants at the time that imetelstat had failed to meet the co-primary endpoints for the vast majority of IMbark trial patients—information that the Defendants should have disclosed and proof that positive reliance is not a prerequisite to recovery. Instead, the withheld facts must be material in the sense that a reasonable investor may have considered them important in making investment decisions. Based on the alleged omissions herein, this requirement is satisfied here.

122. At all relevant times, the market for Geron common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Geron filed periodic public reports with the SEC;

(b) Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and investors, and other similar reporting services;

(c) The Company was covered by research analysts, including Piper Jaffray, B. Riley FBR, BTIG, Cantor Fitzgerald, H.C. Wainwright, Needham & Co.; and

(d) Geron was eligible to file a Form S-3 Registration Statement under the Securities Act of 1933 with the SEC, and, in fact, filed a Registration Statement on Form S-3 on May 24, 2018.

## XII. CLASS ACTION ALLEGATIONS

123. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Geron during the Class Period (the "Class"). Excluded from the Class are Defendants, directors and officers of Geron, and their families and affiliates. The members of the Class are so numerous that joinder of all members is impracticable.

124. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Geron had more than 182 million shares outstanding, owned by approximately 574 shareholders of record, excluding beneficial holders, whose shares are held of record by banks, brokers and other financial institutions.

125. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew, or disregarded with at least deliberate recklessness, that their statements were false and misleading at the time they were made;

(e) Whether the prices of Geron common stock were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

126. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

127. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

128. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII. CAUSES OF ACTION

### COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

129. Plaintiff incorporates ¶¶ 1-128 by reference.

130. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew, or disregarded with at least deliberate recklessness, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

131. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Geron common stock during the Class Period.

132. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Geron common stock. Plaintiff and the Class would not have purchased Geron common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

133. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Geron securities during the Class Period.

**COUNT II**

**For Violation of § 20(a) of the Exchange Act Against Defendant Scarlett**

134. Plaintiff incorporates ¶¶ 1-128 by reference.

135. Defendant Scarlett acted as a controlling person of Geron within the meaning of § 20 of the Exchange Act. By virtue of his position as the Company's President, CEO and a director, and his power to control public statements to investors about Geron, which he exercised throughout the Class Period, Defendant Scarlett had the power and ability to control the actions of Geron and its employees.

136. By reason of such conduct, Defendant Scarlett is liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23, certifying Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel;

B. Awarding Plaintiff and the members of the Class damages and interest;

C. Awarding Plaintiff reasonable costs, including attorneys' fees; and

D. Awarding such equitable injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

DATED: August 20, 2020

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/ *Laurence D. King*
Laurence D. King

Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan (*pro hac vice* to be filed)
Jeffrey P. Campisi (*pro hac vice* to be filed)
850 Third Avenue
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-771
*rkaplan@kaplanfox.com*
*jcampisi@kaplanfox.com*

*Lead Counsel for Lead Plaintiff and the Proposed Class*

# CERTIFICATION

We, Julia Junge and Richard Junge, hereby certify and swear as follows:

1. We have reviewed the consolidated complaint against Geron Corporation and John A. Scarlett alleging violations of the securities laws and authorize its filing;
2. We are willing to serve as a representative party on behalf of a class, or to be members of a group representing a class, including providing testimony at deposition and trial, if necessary;
3. We have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, other than this action;
4. Our transactions in Geron's common stock during the proposed class period are set forth in Schedule A.
5. We did not purchase Geron's common stock at the direction of our counsel or in order to participate in any private action under the federal securities laws; and
6. We will not accept any payment for serving as a representative party on behalf of a class beyond our pro rata share of any recovery, except as ordered or approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

Date: August ____, 2020 ______________________________

8/20/2020

6CF118E44F384BB...

RICHARD JUNGE

DocuSigned by:

Julia Junge

Date: August ____, 2020 ______________________________

A5924D92F4244FD...

8/20/2020

JULIA JUNGE

# Schedule A

## Julia and Richard Junge's Transactions in Geron Corp Common Stock

| Security Name | CUSIP | Transaction | Trade Date | Shares | Price |
|---|---|---|---|---|---|
| **Account 1:** | | | | | |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 2,000 | $6.36 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 200 | $6.35 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 100 | $6.36 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 300 | $6.35 |
| GERON CORP | 374163103 | Buy | 4/6/2018 | 35 | $3.53 |
| GERON CORP | 374163103 | Buy | 5/24/2018 | 4,350 | $4.88 |
| GERON CORP | 374163103 | Buy | 5/29/2018 | 100 | $4.79 |
| GERON CORP | 374163103 | Buy | 6/4/2018 | 35 | $3.91 |
| GERON CORP | 374163103 | Buy | 6/4/2018 | 1,050 | $3.78 |
| GERON CORP | 374163103 | Buy | 6/13/2018 | 2,700 | $3.77 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 35 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 300 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 395 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 14,365 | $3.42 |
| GERON CORP | 374163103 | Buy | 8/30/2018 | 12 | $5.48 |
| GERON CORP | 374163103 | Buy | 9/11/2018 | 255 | $6.34 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 1,003 | $5.52 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 3,800 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 100 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 800 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 300 | $5.51 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 2,891 | $5.50 |
| GERON CORP | 374163103 | Buy | 9/21/2018 | 38,606 | $5.52 |
| | | | | | |
| **Account 2:** | | | | | |
| GERON CORP | 374163103 | Buy | 3/23/2018 | 1,750 | $5.84 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 3,500 | $6.28 |
| GERON CORP | 374163103 | Buy | 3/26/2018 | 4,000 | $6.25 |
| GERON CORP | 374163103 | Buy | 3/28/2018 | 1,000 | $4.52 |
| GERON CORP | 374163103 | Buy | 4/3/2018 | 425 | $4.00 |
| GERON CORP | 374163103 | Buy | 4/6/2018 | 35 | $3.52 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 16,700 | $4.03 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 800 | $4.03 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 200 | $4.03 |
| GERON CORP | 374163103 | Buy | 4/26/2018 | 1,500 | $4.03 |

| | | | | | |
|---|---|---|---|---|---|
| GERON CORP | 374163103 | Buy | 5/7/2018 | 390 | $3.85 |
| GERON CORP | 374163103 | Buy | 6/4/2018 | 185 | $3.89 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 519 | $3.43 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 5,200 | $5.23 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 5,200 | $5.22 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 200 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 100 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 100 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 200 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 900 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 200 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 1,000 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 100 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 600 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 3,500 | $5.21 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 3,300 | $5.53 |
| GERON CORP | 374163103 | Buy | 9/5/2018 | 220 | $5.75 |
| | | | | | |
| **Account 3:** | | | | | |
| GERON CORP | 374163103 | Buy | 9/5/2018 | 98 | $5.99 |
| | | | | | |
| **Account 4:** | | | | | |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 300 | $6.42 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 2,300 | $6.21 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 200 | $6.21 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 2,400 | $6.20 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 1,400 | $6.19 |
| GERON CORP | 374163103 | Buy | 3/22/2018 | 3,700 | $6.18 |
| GERON CORP | 374163103 | Buy | 4/6/2018 | 75 | $3.53 |
| GERON CORP | 374163103 | Buy | 5/21/2018 | 4,580 | $3.57 |
| GERON CORP | 374163103 | Buy | 7/5/2018 | 2,080 | $3.87 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 200 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 600 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 600 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 107 | $3.42 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 200 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 600 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 100 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 200 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 800 | $3.41 |
| GERON CORP | 374163103 | Buy | 7/19/2018 | 100 | $3.41 |

| | | | | | |
|---|---|---|---|---|---|
| GERON CORP | 374163103 | Buy | 8/29/2018 | 340 | $5.39 |
| GERON CORP | 374163103 | Buy | 8/29/2018 | 1,800 | $5.53 |